No. 22-2080

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

_____

KIMBERLY CONNORS,
Plaintiff-Appellant,

v.

MERIT ENERGY COMPANY, LLC,
Defendant-Appellee.

_____

On Appeal from the United States District Court
for the Western District of Arkansas, No. 2:20-cv-02217
Hon. P.K. Holmes, III, United States District Judge

_____

BRIEF OF THE EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION AS AMICUS CURIAE IN SUPPORT OF
PLAINTIFF-APPELLANT AND REVERSAL

_____

GWENDOLYN YOUNG REAMS
Acting General Counsel

JENNIFER S. GOLDSTEIN
Associate General Counsel

ANNE NOEL OCCHIALINO
Acting Assistant General Counsel

NICOLAS SANSONE
Attorney

EQUAL EMPLOYMENT
  OPPORTUNITY COMMISSION
Office of General Counsel
131 M St., NE, 5th Floor
Washington, DC 20507
(202) 921-3134
Nicolas.Sansone@eeoc.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... iii

STATEMENT OF INTEREST ............................................................... 1

STATEMENT OF THE ISSUE ............................................................... 1

STATEMENT OF THE CASE .............................................................. 2

    A.  Statement of Facts .................................................................. 2

        Connors's twenty-plus years as a lease operator ..................... 2

        Merit considers twenty-three applicants for twenty
        positions ............................................................................. 4

        Merit hires twenty men, rejecting Connors and two others ..... 6

        Munger and Sanders's explanations for their decision ............ 8

        Connors's discrimination charge and lawsuit ......................... 11

    B.  District Court's Decision ........................................................ 12

ARGUMENT ....................................................................................... 14

Summary judgment was inappropriate because a reasonable jury could
find sex discrimination based on Connors's prima facie case and
evidence casting doubt on Merit's proffered nondiscriminatory
rationales. ........................................................................................... 14

    A.  Connors made out a prima facie case by showing Merit hired
        men into twenty open positions for which she was qualified. ... 16

    B.  A jury could infer pretext from Connors's comparative strength
        as an applicant, the shifting nature of Merit's post hoc
        rationales, and evidence contradicting the factual basis for
        those rationales. ................................................................... 17

        1.  Selection of multiple less qualified candidates ................... 18

        2.  Post hoc nature of justifications .......................................... 20

i

3.  Inconsistency of justifications ............................................. 21

4.  Evidence affirmatively discrediting specific rationales ...... 24

5.  Reliance on subjective impressions ..................................... 28

CONCLUSION .................................................................................. 31

CERTIFICATE OF COMPLIANCE ....................................................... 32

CERTIFICATE OF SERVICE .............................................................. 33

Appellate Case: 22-2080     Page: 3     Date Filed: 07/19/2022 Entry ID: 5178543

# TABLE OF AUTHORITIES

## Cases

*Baker v. Silver Oak Senior Living Mgmt. Co.*, 581 F.3d 684
(8th Cir. 2009) ........................................................................ 21, 23

*Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782
(8th Cir. 2011) ................................................................................. 19

*Bassett v. City of Minneapolis*, 211 F.3d 1097 (8th Cir. 2000) ............... 20

*Chambers v. Metro. Prop. & Cas. Ins. Co.*, 351 F.3d 848
(8th Cir. 2003) ................................................................................. 29

*Fatemi v. White*, 775 F.3d 1022 (8th Cir. 2015) ...................................... 23

*Foster v. Wyrick*, 823 F.2d 218 (8th Cir. 1987) ........................................ 15

*Furnco Constr. Corp. v. Waters*, 438 U.S. 567 (1978) ............................. 24

*Gaworski v. ITT Com. Fin. Corp.*, 17 F.3d 1104 (8th Cir. 1994) ............ 15

*Gibson v. Geithner*, 776 F.3d 536 (8th Cir. 2015) ................................... 16

*Kim v. Nash Finch Co.*, 123 F.3d 1046 (8th Cir. 1997) ........................... 21

*Kincaid v. City of Omaha*, 378 F.3d 799 (8th Cir. 2004) ........................ 18

*McCullough v. Real Foods, Inc.*, 140 F.3d 1123 (8th Cir. 1998) ...... 18, 30

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ...................... 12

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000).... 15, 30

*Rothmeier v. Inv. Advisers, Inc.*, 85 F.3d 1328 (8th Cir. 1996) .............. 14

*St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993) .............................. 16

*Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011)
(en banc) ...................................................................................... 15, 16

iii

*Turner v. Honeywell Fed. Mfg. & Techs., LLC*, 336 F.3d 716
  (8th Cir. 2003) ................................................................. 17

**Statutes**

42 U.S.C. § 2000e-2 ........................................................... 1

**Rules**

Fed. R. App. P. 29 ............................................................. 1

Appellate Case: 22-2080   Page: 5   Date Filed: 07/19/2022 Entry ID: 5178543

## STATEMENT OF INTEREST

Congress tasked the Equal Employment Opportunity Commission (EEOC) with administering and enforcing Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* Title VII prohibits an employer from "fail[ing] or refus[ing] to hire … any individual … because of such individual's … sex." 42 U.S.C. § 2000e-2(a)(1). This case involves the legal standards for determining whether a rejected job applicant has produced sufficient circumstantial evidence of sex discrimination to permit her to present her case to a jury. Because the EEOC has a strong interest in ensuring courts properly apply these foundational, frequently recurring summary judgment standards, the EEOC offers its views pursuant to Federal Rule of Appellate Procedure 29(a)(2).

## STATEMENT OF THE ISSUE[1]

Whether there is sufficient circumstantial evidence to allow a rejected job applicant's sex discrimination claim to go to a jury where (1) the applicant has made out a prima facie case and where (2) she proffered evidence that she was more qualified than several successful applicants and that the employer's reasons for rejecting her lack

---

[1] The EEOC takes no position on any other issue in this appeal.

1

support in the contemporaneous record of the hiring process, have
shifted over time, and rest on disputed facts.

- *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000)

## STATEMENT OF THE CASE

### A.    Statement of Facts

*Connors's twenty-plus years as a lease operator*

XTO Energy Inc. (XTO) hired Plaintiff-Appellant Kimberly
Connors in 2002 as one of the "lease operators" responsible for
overseeing pumping operations at its gas wells in the Ozark region.
Add. 14; R. Doc. 35-1, at 1.  Connors had eight years' prior experience as
a lease operator at the time of hire.  *Id.*  At all relevant times, Connors
was XTO's only female lease operator in the region.  R. Doc. 36, at 12.

Connors began at XTO as a backup operator who covered others'
assigned wells while they were away.  Add. 14; R. Doc. 35-1, at 1.  But
by 2015, Connors had her own assigned route of fifty-four wells.  Add.
15; R. Doc. 35-1, at 2.  Connors's supervisor, Scott (or "James") Smith
gave her largely positive performance-evaluation remarks throughout
her time at XTO.  Add. 15-17; R. Doc. 35-1, at 2-4; *see* R. Doc. 28-3, at
10.  In Connors's final evaluation, for example, Smith wrote that she
"follow[ed] sound safety [and] environmental practices," made "good

2

decisions on routine problems," was "receptive to instruction, ideas [and] opinions," "dependabl[y]" and "[w]illingly accept[ed] [and] carrie[d] out instructions," did "steady, methodical" work, and was "cost conscious." R. Doc. 28-3, at 71-72. Connors also earned several safety awards, maintained her XTO vehicle in good condition, and held a citation-free driving record. Add. 17-18; R. Doc. 35-1, at 4-5.

At the same time, Connors admits she sometimes "didn't see eye-to-eye" with Smith. R. Doc. 28-3, at 7. She testified, for example, that at times she disagreed with Smith's suggestion that she drop soap into some of her wells to increase their productivity. R. Doc. 28-3, at 11-12; *see* R. Doc. 28-2, at 15 (Smith explaining that soap "will foam up any water that's in the bottom of the well and help the water come out of the wellbore so that the well can produce better"). According to Connors, her experience taught her that soap could actually cause production to "go down" and "stay down" on some of her wells. R. Doc. 28-3, at 12; *see id.* ("There are some wells that soap will do very well, and there are some wells that if you soap it, it'll kill it."). But while Connors disagreed with Smith's judgment, she sometimes followed his advice and "dropped the ... soap," which on at least one occasion caused one of

3

her wells to go "down" for two weeks.  R. Doc. 28-3, at 11-12.  And despite Connors's differences with Smith, she testified that the two of them "could work together, and … did."  R. Doc. 28-3, at 7; *see* R. Doc. 28-3, at 72 (evaluation from Smith noting that Connors "[w]illingly accept[ed] [and] carrie[d] out instructions").

### *Merit considers twenty-three applicants for twenty positions*

In November 2019, XTO announced it was selling its Ozark gas assets to Defendant-Appellee Merit Energy Co., LLC (Merit), at the end of the year.  Add. 18; R. Doc. 35-1, at 5.  Merit made known that it would rehire many—but not all—XTO employees following the sale.  R. Doc. 28-1, at 1-2.  Specifically, Merit planned to rehire twenty of XTO's twenty-nine existing lease operators.  R. Doc. 38, at 1-2.  Because six XTO lease operators chose to retire or transfer internally within XTO instead of seeking a position with Merit, Merit ultimately considered twenty-three applicants, Connors among them, for the twenty available spots.[2]  R. Doc. 35-2, at 10.  Connors testified that two former Merit

---

[2] Merit committed to filling at least one of these spots with specific XTO employees as a condition of the asset sale.  R. Doc. 28-2, at 20.

4

employees warned her at the beginning of the rehire process that "Merit does not hire women." R. Doc. 28-3, at 23.

To evaluate the applicants, Merit supervisors Clay Munger and Randy Sanders interviewed them and did ride-along observations of them performing their job duties. R. Doc. 28-1, at 2. XTO also provided a list noting each applicant's years of experience. R. Doc. 38, at 2. According to Munger, he favorably evaluated lease operators who were punctual and safety-conscious, maximized their wells' productivity, cared for their trucks and other equipment, and generally ensured good housekeeping on the job site. R. Doc. 28-2, at 15.

Connors testified that she interviewed with Munger and Sanders for "probably three minutes" on November 21. R. Doc. 28-3, at 22-23. While Merit claims Connors did not attend her interview, R. Doc. 28-1, at 3, detailed notes about her appear in a November 25 tentative offer list Munger and Sanders compiled "based on [their] interviews with all the prospective employees," R. Doc. 35-2, at 3, 7. The notes mention Connors's eighteen years at XTO and state that she "ha[d] knowledge," was a "[g]ood comm[un]icator, dependable," was "currently dropping quite a few soap sticks," had specific suggestions for how she "may be

5

able to make improve[ments]," and "[s]eem[ed] to know her well personalities." R. Doc. 35-2, at 7. The notes voiced no concerns about Connors's performance, demeanor, enthusiasm, or other qualities.

Connors had her ride-along with Munger the next month. R. Doc. 28-3, at 14. Munger recalls the ride-along taking "probably an hour or two," which was the normal length. R. Doc. 28-2, at 21. But Connors testified that it lasted only twenty minutes, even though a male lease operator with no assigned gas wells told her his ride-along had lasted two hours. Add. 18-19; R. Doc. 35-1, at 5-6. According to Connors, Munger asked her only one question during the ride-along. Add. 18; R. Doc. 35-1, at 5. As for Munger, "about all" he could recall of the ride-along was that he and Connors "went around to a couple of wells talking" while Connors checked well pressures. R. Doc. 28-2, at 21.

Sanders also did a ride-along with Connors. R. Doc. 28-4, at 2. According to Sanders, "[n]othing … stood out to [him], one way or another," about it. *Id.*

### *Merit hires twenty men, rejecting Connors and two others*

Connors was one of the three applicants Merit chose not to rehire. R. Doc. 36, at 8. Because she was XTO's only female lease operator in

6

the area, all twenty rehired applicants were men. R. Doc. 38, at 3.
Munger and Sanders's contemporaneous notes on Connors, described
*supra* at 5-6, were all positive. *See* R. Doc. 35-2, at 7. Sanders testified
that "none of Ms. Connors' supervisors said negative things about her,"
R. Doc. 28-4, at 2, and Munger could not recall Connors's colleagues
making any negative remarks about her either, R. Doc. 28-2, at 24-25.

In contrast, Munger and Sanders's contemporaneous notes on the
other two rejected applicants contain specific criticisms. Notes on one of
them say he "seem[ed] to need constant communication and
reassurance he [was] doing a good job," was "[y]oung but a bit needy,"
and would "Talk Talk Talk." R. Doc. 35-2, at 21. Notes on the other one
refer to him as "quite the talker" and voice "doubts about [his] picking
up speed" and concern that "he is overloaded." R. Doc. 35-2, at 26.

As for the twenty men Merit hired, many of them had fewer years
with XTO and responsibility for fewer wells than Connors did. *See* R.
Doc. 35-2, at 10, 20-27. One of them, for example, was a thirty-two-
year-old who had worked only seven years with XTO and whose
supervisors, Connors testified, questioned his competence. R. Doc. 28-3,
at 16-17. Nor was Connors alone in expressing doubt about some of the

7

successful applicants.  Munger and Sanders's own contemporaneous notes reflect concerns about several of the men they hired over Connors. Notes on one say he "[t]ried to portray hi[m]self as knowledg[e]able of the assets but never felt that way," "[s]ounded full of himself," and "[l]ikely never g[ot] out of his truck."  R. Doc. 35-2, at 25.  Notes on another say he "TEARS UP VEHICLES" and "DOESN'T REPAIR SMALL ITEMS."  R. Doc. 35-2, at 26.  Notes on still another say he "DIDN'T ALWAYS GIVE GOOD ANSWERS" and had a "NASTY TRUCK."  *Id.*  And Munger and Sanders thought that three more others "LACK[ED] KNOWLEDGE" or had "SLOW" or "LIMITED KNOWLEDGE," and that one of these three did "not spend enough time on each [well] location."  R. Doc. 35-2, at 24-25, 27; *see* R. Doc. 35-2 at 24 (describing yet another successful applicant who was "nothing special[,] middle of the road" and who "d[idn't] have much plunger knowledge").

> ### *Munger and Sanders's explanations for their decision*

Munger now says his "largest concern" about Connors was that she wore her fire-resistant shirt "unbuttoned" during his ride-along and "several times at the office."  R. Doc. 28-2, at 22.  He claims this "made [him] believe that she had a blatant disregard for XTO's policy of

Appellate Case: 22-2080    Page: 13    Date Filed: 07/19/2022 Entry ID: 5178543

wearing [fire-resistant] clothing to keep her safe." R. Doc. 37-1, at 1. Connors, though, testified that at all relevant times her fire-resistant shirt was a buttonless pullover XTO had issued her as a safety award and that she was wearing her personal protective equipment "to all its glory" during her ride-along. R. Doc. 28-3, at 14-16. While a photo XTO took of Connors at the office when creating her employee badge does show her in an unbuttoned shirt, Connors testified that XTO took this photo some time ago, before a period of weight gain led her to "turn[] in [her] button-ups" in favor of her pullover. R. Doc. 28-3, at 16-18, 101. And, Connors testified, XTO did not require its employees to wear fire-resistant clothing while in the office in any event. R. Doc. 28-3, at 18.

Munger also testified that, after his ride-along with Connors, he found out that Connors's supervisor, Smith, had another lease operator, Giles France, dropping soap into Connors's wells. R. Doc. 28-2, at 22. Smith reportedly told Munger that "if a person dropped a lot more soap" in Connors's wells, "more production could be gained," and Munger says he took this to mean that Connors "was dropping an inadequate amount of soap." R. Doc. 28-2, at 24. But Munger did not ask Connors about the arrangement with France, and he did not know whether Smith had

9

France soaping anybody else's wells.  R. Doc. 28-2, at 22.  Moreover, Munger testified that he knew most of France's own route "was not operating at the time" France was helping Connors.  *Id.*  As Connors explained, Smith "needed to justify" retaining France while his route was inoperative and so had France assist her (as well as others) because she was managing such a large number of wells.  R. Doc. 28-3, at 19.

Unlike Munger, Sanders cited neither safety nor productivity issues as prompting the decision not to hire Connors.  *See* R. Doc. 28-4, at 1-3.  Rather, he testified that he and Munger simply found XTO supervisors "more complimentary about other lease operators" than about Connors.  R. Doc. 28-4, at 2.  While Sanders "did not rule out Ms. Connors immediately," he says he ultimately found that "other XTO lease operators seemed more enthusiastic in their interviews about working for Merit, got better reviews from supervisors, and presented no job duty concerns."  R. Doc. 28-4, at 2-3.  Munger, though, testified that Connors "wasn't unenthusiastic about the job," despite being "not very fond of her management."  R. Doc. 28-2, at 25.  And he also testified that no applicant was "particularly enthusiastic" per se.  *Id.*

*Connors's discrimination charge and lawsuit*

After Merit rejected her application, Connors filed an EEOC charge alleging among other things that Merit discriminated against her because of her sex. R. Doc. 2, at 4. In its statement to the EEOC, Merit explained its decision not to hire Connors by saying the successful applicants "demonstrated a greater enthusiasm for the position, shared process improvement ideas during their interview, and wore their fire resistant clothing … properly." Add. 22; R. Doc. 28-1, at 6.

The EEOC issued Connors a right-to-sue letter, and she filed this lawsuit, claiming (as relevant) that Merit violated Title VII's bar on sex discrimination in hiring. R. Doc. 2, at 5; *see* Add. 10-11; R. Doc. 2-1, at 1-2. In discovery, Merit's Vice President of Human Resources produced an affidavit attributing the decision not to hire Connors to the fact that she was "repeatedly observed not wearing her fire-resistant clothing properly" and to two new factors Merit had not raised in its EEOC response: that Connors "missed her formal interview with Merit" and "had another XTO employee work on some of her wells to increase their production instead of doing that work herself." R. Doc. 28-1, at 3.

11

Merit then moved for summary judgment.  R. Doc. 28.  In its brief, Merit cited further new reasons for refusing to rehire Connors, claiming she "did not have the strongest job application of all the applicants," not only because of Merit's previously-stated "concerns over how she wore her fire-resistant clothing," but also now because of her "ongoing feud with her immediate supervisor, her generally negative attitude, [and] her absence of supervisor support."  R. Doc. 29, at 9.  Merit's brief made no mention of Connors allegedly missing her interview.

## B.    District Court's Decision

The district court granted summary judgment for Merit on Connors's Title VII claim.[3]  Add. 4-8; R. Doc. 39, at 3-7.  Seeing no direct evidence of sex discrimination, the court applied the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Add. 4-5; R. Doc. 39, at 3-4.  The court assumed Connors could establish a prima facie case of discrimination and then noted that Merit offered "legitimate non-discriminatory reasons for its decision not to

---

[3] The district court also granted summary judgment for Merit on claims Connors raised under the Age Discrimination in Employment Act and the Arkansas Civil Rights Act.  Add. 8-9; R. Doc. 39, at 7-8.  The EEOC takes no position on these rulings.

Appellate Case: 22-2080     Page: 17     Date Filed: 07/19/2022 Entry ID: 5178543

hire [her]": namely, "safety concerns regarding her alleged failure to wear her fire-resistant clothing properly, her lack of enthusiasm, the clashes with her XTO supervisor, and the lack of strong endorsements from other XTO supervisors." Add. 5; R. Doc. 39, at 4. And, according to the district court, Connors "admit[ted] that Smith had another lease operator dropping soap sticks on her route because she refused to follow instructions." Add. 6; R. Doc. 39, at 5.

The district court then held that no reasonable jury could find these reasons were pretextual. Add. 6-8; R. Doc. 39, at 5-7. The court first rejected Connors's argument that a jury could infer pretext from the fact that she was more qualified than the applicants who were rehired. Add. 6; R. Doc. 39, at 5. As the court explained, "even the employee with the least amount of experience had still been employed as a lease operator for [seven] years," so "it cannot be said that any successful candidate was unqualified for the position he was hired for." *Id.* And, the court continued, "seniority alone is not the sole determiner of what makes an employee more or less qualified, and an employer may consider subjective components in making hiring decisions." *Id.*

13

The court next stated that, in its view, there was no "persuasive evidence that [Connors's] gender was in any way considered throughout her interview process." Add. 7; R. Doc. 39, at 6. Finally, the court rejected Connors's argument that a jury could infer pretext from Merit's "shifting justifications for its decision not to hire [her]." *Id.* As the court saw it, Merit had been consistent in saying it chose not to hire Connors "because she was observed wearing her fire-resistant clothing improperly, she did little to try to increase or maintain production on her wells, and Munger had been informed by another XTO employee and Scott Smith that [Connors] refused to drop soap on her wells." *Id.*

## ARGUMENT

**Summary judgment was inappropriate because a reasonable jury could find sex discrimination based on Connors's prima facie case and evidence casting doubt on Merit's proffered nondiscriminatory rationales.**

As this Court has noted, "the 'smoking-gun' case" of employment discrimination "is rare" because "a shrewd employer will not leave a trail of direct inculpatory evidence for the plaintiff to bring into court." *Rothmeier v. Inv. Advisers, Inc.*, 85 F.3d 1328, 1332 (8th Cir. 1996). Accordingly, "[p]roof of an intentional discrimination claim, in most instances, is based on circumstantial evidence." *Foster v. Wyrick*, 823

14

F.2d 218, 222 (8th Cir. 1987); *see Gaworski v. ITT Com. Fin. Corp.*, 17 F.3d 1104, 1108 (8th Cir. 1994) ("It is axiomatic that employment discrimination need not be proved by direct evidence, and indeed, that doing so is often impossible ….").  The opinion below correctly observed that a plaintiff may prove discrimination through circumstantial evidence.  Add. 4-5; R. Doc. 39, at 3-4.  But it then proceeded to fault Connors for a lack of direct evidence that her "gender was … considered throughout her [hiring] process," Add. 7; R. Doc. 39, at 6, and to impose an unduly stringent standard for the quantum of evidence necessary for a circumstantial discrimination case to proceed to a jury.

The Supreme Court unanimously held in *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000), that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated," *id.* at 148; *see Torgerson v. City of Rochester*, 643 F.3d 1031, 1046 (8th Cir. 2011) (en banc) (same).  Here, Connors established a prima facie case and produced evidence that could lead a jury to doubt Merit's proffered justifications.  Under *Reeves*, then, summary judgment was inappropriate because a

15

reasonable jury could—though need not—find that Merit failed to hire Connors because of her sex. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 n.4 (1993) (noting that "rejection of the defendant's proffered reasons is enough at law to *sustain* a finding of discrimination," while emphasizing that "*there must* [*ultimately*] *be a finding of discrimination*" for liability).

### A. Connors made out a prima facie case by showing Merit hired men into twenty open positions for which she was qualified.

A plaintiff establishes a prima facie case of discriminatory hiring if she shows that "(1) she is in a protected class; (2) she was qualified for an open position; (3) she was denied that position; and (4) the [employer] filled the position with a person not in the same protected class." *Torgerson*, 643 F.3d at 1046 (alteration in original) (quoting *Dixon v. Pulaski Cnty. Special Sch. Dist.*, 578 F.3d 862, 867-68 (8th Cir. 2009)). This Court has characterized "the threshold of proof necessary" to make this showing as "minimal," *Gibson v. Geithner*, 776 F.3d 536, 540 (8th Cir. 2015), and "not onerous," *Torgerson*, 643 F.3d at 1047 (quoting *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)).

16

The district court here correctly assumed Connors cleared this low bar. Add. 5; R. Doc. 39, at 4. Merit declined to hire Connors, a woman, into any of twenty available lease operator positions, instead filling them all with men. And a jury could easily find Connors qualified, given that she had more than twenty years' experience as a lease operator and received positive evaluations in the years leading up to Merit's hiring decision. *See Turner v. Honeywell Fed. Mfg. & Techs., LLC*, 336 F.3d 716, 720-21 (8th Cir. 2003) (noting that a plaintiff can show qualification where there is evidence she was "minimally qualified for the position[]"), *abrogated in part on other grounds by Torgerson*, 643 F.3d 1031. Connors has thus produced sufficient evidence to carry her threshold burden and to require Merit to come forward with the reasons it declined to hire her.

**B.    A jury could infer pretext from Connors's comparative strength as an applicant, the shifting nature of Merit's post hoc rationales, and evidence contradicting the factual basis for those rationales.**

Although the district court properly assumed Connors established a prima facie case, it erred in holding that every reasonable jury would have to credit the nondiscriminatory reasons Merit offered for including Connors among the three rejected applicants. To be sure, as the district

17

court stated, "an employer may consider subjective components in making hiring decisions." Add. 6; R. Doc. 39, at 5. But the question on summary judgment is whether the evidence would permit a jury to find that the employer did not in fact rely on the subjective considerations it proffered and instead acted for discriminatory reasons. This Court's precedents identify several factors capable of supporting such a finding. And where, as here, these factors cumulatively create a fact dispute as to pretext—and so, under *Reeves*, as to the ultimate question of discrimination—summary judgment is inappropriate.

### 1. *Selection of multiple less qualified candidates*

This Court has acknowledged that "an employer's selection of a less qualified candidate 'can support a finding that the employer's nondiscriminatory reason for the hiring was pretextual.'" *Kincaid v. City of Omaha*, 378 F.3d 799, 805 (8th Cir. 2004) (quoting *Duffy v. Wolle*, 123 F.3d 1026, 1037 (8th Cir. 1997)). After all, "it is common business practice to pick the best qualified candidate," and "[w]hen that is not done, a reasonable inference arises" that other factors are at play. *McCullough v. Real Foods, Inc.*, 140 F.3d 1123, 1129 (8th Cir. 1998).

18

The record here supports a reasonable finding that Connors was more qualified than many of the men Merit hired. Several successful male applicants had less experience than Connors and managed fewer wells. *See* R. Doc. 35-2, at 10, 20-27. The district court was correct, to be sure, that "seniority alone is not the sole determiner of what makes an employee more or less qualified." Add. 6; R. Doc. 39, at 5. But while an experienced employee's qualifications do not render her objectively superior if they are "outweighed by other strengths and experiences that [another applicant] would bring to the position," *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 793 (8th Cir. 2011), a jury here could infer that Connors's junior colleagues offered no such countervailing advantages. As against Connors's eighteen years at XTO, "knowledge," and familiarity with her "well personalities," R. Doc. 35-2, at 7, Munger and Sanders viewed some of the less experienced men they hired as "LACK[ING] KNOWLEDGE," having "SLOW" or "LIMITED KNOWLEDGE," R. Doc. 35-2, at 24-25, 27, or falling short in other ways, *see supra* at 8 (cataloguing criticisms).

Certainly, as the district court emphasized, these comparators were not necessarily "unqualified." Add. 6; R. Doc. 39, at 5. A jury,

19

though, could find that their relative lack of knowledge and experience made at least some of them significantly *less* qualified than Connors, casting doubt on the idea that Merit had nondiscriminatory reasons for preferring them.[4] And evidence that Connors received shorter ride-alongs than her male counterparts, Add. 18-19; R. Doc. 35-1, at 5-6; *see* R. Doc. 28-3, at 15, could bolster a reasonable conclusion that Merit did not afford Connors the same consideration it gave male applicants.

### 2. *Post hoc nature of justifications*

Another factor that could "weigh heavily in [a plaintiff's] favor as evidence of pretext" is a lack of contemporaneous evidence that an employer's proffered post hoc rationales factored into its decision-making process at the time. *Bassett v. City of Minneapolis*, 211 F.3d 1097, 1108 (8th Cir. 2000) (treating the fact that employer documented its criticisms of plaintiff "as much as six months after-the-fact" as probative of pretext), *abrogated in part on other grounds by Torgerson*,

---

[4] In its summary judgment brief, Merit argued that Connors's experience may not have been valuable because "her old route and the wells she was familiar with have changed and been reorganized as Merit acquired additional properties." R. Doc. 29, at 13. But there is no evidence Munger and Sanders were considering the possibility of future route changes at the time they made their hiring decisions.

Appellate Case: 22-2080    Page: 25    Date Filed: 07/19/2022 Entry ID: 5178543

643 F.3d 1031; *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1061 (8th Cir. 1997) (holding jury could infer pretext where employer put criticisms in employee's file only after employee filed a discrimination charge).

Here, there is no contemporaneous evidence of Merit relying on, or even making note of, any of the considerations it has since proffered for not selecting Connors. To the contrary, the notes Merit kept about Connors during the hiring process were uniformly positive, *see* R. Doc. 35-2, at 7, even while the record is replete with Merit's contemporaneous negative remarks about several of the male lease operators it hired instead, *see supra* at 8.

### 3. *Inconsistency of justifications*

While "[n]ot every supplement to an employer's initial statement of reasons gives rise to an inference of pretext," this Court recognizes that "substantial variations raise suspicion." *Baker v. Silver Oak Senior Living Mgmt. Co.*, 581 F.3d 684, 689 (8th Cir. 2009). Here, a reasonable jury could find substantial variations in Merit's reasons for not hiring Connors.

The district court took the view that Munger has been consistent in attributing the hiring decision to concerns about Connors's fire-

Appellate Case: 22-2080    Page: 26    Date Filed: 07/19/2022 Entry ID: 5178543

resistant clothing and the fact that France soaped some of her wells. Add. 7; R. Doc. 39, at 6. But even if the court was correct on that point, the fact that an employer has been consistent in some ways does not prevent a jury from reasonably growing suspicious if the employer has been inconsistent in other ways. And here, the district court overlooked two important ways in which a jury's suspicions could thus be roused.

First, even if one decision-maker has given consistent reasons, a reasonable jury could suspect pretext where a second decision-maker who worked in tandem with the first gives an entirely different account of the decisional process. In its briefing below, Merit emphasized that "Munger did not act alone" and that he and Sanders were jointly responsible for hiring decisions. R. Doc. 37, at 3. But the highly specific safety and productivity concerns to which Munger attributes the hiring decision are fully absent from Sanders's account. Instead, Sanders simply said that "[Munger] and I noticed that the XTO supervisors were more complimentary about other lease operators." R. Doc. 28-4, at 2.

Second, even where *some* of the employer's justifications remain consistent over time, this Court has recognized that the subsequent addition of new justifications the employer could have—but did not—

22

offer at the outset could contribute to a finding of pretext. *See Baker*, 581 F.3d at 689 (finding evidence of "shifting explanations" where an employer added several further justifications for a challenged termination decision during litigation). In this case, a jury could infer pretext from the fact that Merit waited to raise at least two highly specific rationales in *any* form—Connors's alleged failure to attend her interview and her supposed feud with Smith—until well into litigation. *Compare, e.g.*, *Fatemi v. White*, 775 F.3d 1022, 1048 (8th Cir. 2015) (finding insufficient evidence of "shifting explanations" where employer's second statement simply "expound[ed] on the first [one], setting forth examples of … problems" to which the employer had initially alluded only generally). An applicant's missing a job interview would in particular be likely to make a strong impression on an employer. A reasonable jury could thus be skeptical of Merit's explanation based on its belated assertion—which it has since apparently abandoned—that Connors's alleged failure to attend her interview factored into the decision not to hire her.

Appellate Case: 22-2080     Page: 28     Date Filed: 07/19/2022 Entry ID: 5178543

### 4. *Evidence affirmatively discrediting specific rationales*

Even apart from the foregoing factors, a reasonable jury can infer pretext where there is evidence that, if believed, would undermine the factual basis for the employer's proffered reasons. *See Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978) ("[W]hen all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts only with *some* reason, based his decision on an impermissible consideration ...."). Such is the case here. The district court rightly recognized that Merit proffered several subjective considerations that, if genuine, would be fully legitimate bases for rejecting Connors. Add. 5-6; R. Doc. 39, at 4-5. But it misapplied the summary judgment standard by failing to acknowledge evidence calling each of these considerations into question.

First, Munger—though not Sanders—said his "largest concern" about Connors was that he saw her wearing her fire-resistant shirt "open" and "unbuttoned all the time." R. Doc. 28-2, at 22. But a jury could discredit Munger's claim that he saw Connors in an unbuttoned shirt. Connors testified that she had "turned in [her] button-ups" in

24

favor of a fire-resistant buttonless pullover XTO issued her, R. Doc. 28-3, at 16, casting doubt on whether Munger actually saw her in unbuttoned fire-resistant shirts. And Connors testified that she was wearing all her personal protective gear properly during her ride-along with Munger. R. Doc. 28-3, at 14; *see* Add. 17; R. Doc. 35-1, at 4 (evidence of Connors regularly receiving safety awards and positive safety-related feedback at XTO). Although Merit has argued that "whether [Connors] was or was not wearing her equipment improperly is immaterial" because Munger *believed* she was doing so, R. Doc. 37, at 5, a jury that found Munger never saw Connors wearing a button-down shirt at all could easily disbelieve that he thought he saw her wearing one "undone all the way," R. Doc. 28-2, at 22.

It is true that a photograph XTO took at its office when it assigned Connors a badge shows her in an unbuttoned shirt. R. Doc. 28-3, at 17, 101. But because there is evidence that XTO took the photograph "before [Connors] gained all [her] weight and turned all [her button-down] shirts in," it cannot undisputedly support Munger's claim that he saw Connors with her shirt unbuttoned. R. Doc. 28-3, at 18. Nor would it otherwise compel a jury to credit Munger's supposed safety concerns.

25

Merit has offered no reason it would be unsafe or improper for an employee to wear an unbuttoned shirt while not in the field. Indeed, Connors testified that XTO did not require employees to wear fire-resistant clothing in the office where the photograph was taken, *id.*, and multiple employees are accordingly wearing street clothes, rather than fully buttoned protective gear, in their photographs. R. Doc. 28-3, at 85-101. In any event, Munger claimed to base his safety concerns on his firsthand observation of Connors in an unbuttoned shirt and not on assumptions he made about her from seeing her badge photograph. R. Doc. 28-2, at 22; R. Doc. 37-1; *see* R. Doc. 37, at 6 (Merit noting it cited the photograph "only to illustrate what Mr. Munger testified he saw").

Second, a jury could reasonably discredit Munger's alleged belief that Connors was inadequately soaping her wells. While Munger now says he interpreted one of Smith's remarks, along with France's activity on Connors's route, to mean Connors was not dropping enough soap, R. Doc. 28-2, at 22, 24, his contemporaneous notes specifically describe Connors as "currently dropping quite a few soap sticks," R. Doc. 35-2, at 7. Moreover, France's own route was mostly inoperative at the time, and Munger admits he did not know whether it was unusual that

France was helping Connors.  R. Doc. 28-2, at 22.  Indeed, Munger's contemporaneous view that Connors was frequently soaping her wells finds at least as much record support as his later-professed concern that she was not.  Contrary to the district court's claim that Connors "refused to follow [Smith's] instructions" on soaping, Add. 6; R. Doc. 39, at 5, Connors testified that she did comply with his directives, even against her better judgment, *see* R. Doc. 28-3, at 11-12 (Connors testifying that she "dropped the … soap" when Smith told her to).  And Smith's evaluations of Connors describe her as "receptive to instruction, ideas [and] opinions" and as "dependabl[y]" and "[w]illingly accept[ing] [and] carr[ying] out instructions."  R. Doc. 28-3, at 71-72.

Third, this evidence could also lead a jury to reject the claim in Merit's summary judgment brief that Merit rejected Connors because she had a "difficult working relationship[]" with Smith or was otherwise "difficult" or unenthusiastic.  R. Doc. 37, at 6.  While Munger testified to knowing Connors "was not very fond of her management," R. Doc. 28-2, at 25, neither he nor Sanders cited this or any other evidence of "difficulty" as a factor in the hiring decision.  Rather, Sanders and Munger testified that they heard no negative remarks from Connors's

27

colleagues or supervisors, R. Doc. 28-2, at 24-25; R. Doc. 28-4, at 2, and Munger admitted that while no applicant stood out for enthusiasm, Connors in particular "wasn't unenthusiastic about the job," R. Doc. 28-2, at 25. Smith's evaluations of Connors describe her as responsive and dependable. *See supra* at 2-3. And Connors testified that she and Smith "could work together, and … did." R. Doc. 28-3, at 7.

Finally, the two remaining specific rationales Merit has given at various times—that Connors missed her interview and gave no "process improvement ideas," Add. 22; R. Doc. 28-1, at 6; *see* R. Doc. 28-1, at 3—also rest on disputed facts. Connors testified to attending an interview on November 21, 2019, and Munger circulated detailed notes on her four days later "based on" the interviews. R. Doc. 28-3, at 22-23; R. Doc. 35-2, at 3, 7. Among the notes were specific ideas Connors had given on how she "may be able to make improve[ments]." R. Doc. 35-2, at 7.

### 5. *Reliance on subjective impressions*

As the district court correctly noted, this Court has recognized an employer's entitlement to rely on subjective impressions in hiring. Add. 6; R. Doc. 39, at 5. At the same time, however, this Court has explained that such impressions are "easily fabricated" and so must be carefully

28

examined at the summary judgment stage. *Chambers v. Metro. Prop. & Cas. Ins. Co.*, 351 F.3d 848, 858 (8th Cir. 2003).[5]

Given that a reasonable jury could doubt the sincerity of each of the specific reasons Merit has given for refusing to hire Connors, *see supra* at 24-28, Merit is left with its broader contention that it simply had a better subjective impression of other candidates. Specifically, Sanders testified that XTO supervisors, while not critical of Connors, were "more complimentary about" unspecified others and that Connors, while not *un*enthusiastic, was comparatively *less* enthusiastic. R. Doc. 28-4, at 2. Because the only realistic way to probe the veracity of these impressionistic statements is firsthand assessment of witness credibility, they cannot form a sufficient basis for summary judgment where, as here, the evidence "cast[s] doubt" on the more specific "justifications offered by the employer." *Chambers*, 351 F.3d at 858.

A contrary conclusion would undermine Title VII's efficacy in discrimination cases based on circumstantial evidence. The Supreme

---

[5] In *Chambers*, this Court ultimately held that where there was no overall objective disparity in candidates' qualifications and the employer presented "a legitimate business consideration" for the factors upon which it relied, no inference of discrimination arose from the employer's reliance on subjective considerations. 351 F.3d at 858.

Appellate Case: 22-2080     Page: 34     Date Filed: 07/19/2022 Entry ID: 5178543

Court has held that a jury may "reasonably infer from the falsity" of an employer's specific justifications "that the employer is dissembling to cover up a discriminatory purpose." *Reeves*, 530 U.S. at 147. If an employer could conclusively rebut that inference by stating that it had a general, subjective preference for the candidates it hired, no failure-to-hire case would go to a jury absent direct evidence of discrimination. But this Court recognizes that "when the whole of the evidence raises a reasonable inference that '[an employer's] business judgments involve intentional discrimination,' the law permits the person who claims to have been discriminated against to have her day in court." *McCullough*, 140 F.3d at 1129 (quoting *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 781 (8th Cir. 1995)). Because such an inference is available here, Connors should be entitled to a jury trial.

30

## CONCLUSION

For the foregoing reasons, this Court should reverse the decision below and remand for further proceedings.

Respectfully submitted,

GWENDOLYN YOUNG REAMS
Acting General Counsel

JENNIFER S. GOLDSTEIN
Associate General Counsel

ANNE NOEL OCCHIALINO
Acting Assistant General Counsel

/s/ Nicolas Sansone
NICOLAS SANSONE
Attorney
EQUAL EMPLOYMENT
  OPPORTUNITY COMMISSION
Office of General Counsel
131 M St., NE, 5th Floor
Washington, DC 20507
(202) 921-3134
Nicolas.Sansone@eeoc.gov

31

# CERTIFICATE OF COMPLIANCE

I certify that the foregoing brief complies with the type-volume requirements of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because it contains 6,191 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief also complies with the typeface and type style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word with 14-point Century Schoolbook.

Pursuant to Eighth Circuit Rule 28A(h)(2), I certify that I have scanned the brief for viruses on July 18, 2022, with Microsoft Windows Defender, and that the brief is virus-free.

/s/ Nicolas Sansone
NICOLAS SANSONE
Attorney
EQUAL EMPLOYMENT
  OPPORTUNITY COMMISSION
Office of General Counsel
131 M St., NE, 5th Floor
Washington, DC 20507
(202) 921-3134
Nicolas.Sansone@eeoc.gov

Dated: July 18, 2022

Appellate Case: 22-2080    Page: 37    Date Filed: 07/19/2022 Entry ID: 5178543

# CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing amicus curiae brief with the Court via the appellate CM/ECF system on July 18, 2022, which will send notification of such filing to all counsel of record. I also certify that I will file ten paper copies of the foregoing brief with the Court, and one paper copy of the foregoing brief to each of the following counsel of record, as required by Eighth Circuit Rule 28A(d):

<u>Counsel for Appellant</u>
Jeremy B. Lowrey
Law Office of Jeremy B. Lowrey
P.O. Box 153
Sheridan, AR 72150

<u>Counsel for Appellee</u>
Michael Bailey Heister
Quattlebaum & Grooms
111 Center St., Suite 1900
Little Rock, AR 72201

<u>/s/ Nicolas Sansone</u>
NICOLAS SANSONE
Attorney
EQUAL EMPLOYMENT
  OPPORTUNITY COMMISSION
Office of General Counsel
131 M St., NE, 5th Floor
Washington, DC 20507
(202) 921-3134
Nicolas.Sansone@eeoc.gov

33